JOHN GARREANS, JR., A MINOR, BY HIS NEXT FRIEND AND FATHER, JOHN GARREANS, SR., ET AL., APPELLEES, V. CITY OF OMAHA, A MUNICIPAL CORPORATION, APPELLANT.

345 N.W.2d 309

Filed February 17, 1984. No. 82-814.

Herbert M. Fitle, City Attorney, James E. Fellows, and Timothy M. Kenny, for appellant.

Thomas F. Dowd and John P. Fahey of Dowd & Fahey, and J. Patrick Green, for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

BOSLAUGH, J.

This is an action under the Nebraska Political Subdivisions Tort Claims Act against the City of Omaha, Nebraska, to recover damages for the injuries sustained by the plaintiffs, John Garreans, Jr., and Vince Hartline, in an explosion which occurred at N.P. Dodge Park on July 5, 1980, while the plaintiffs were visiting with their grandparents, Ray and Evelyn Stoops, at the park. The petition included a second cause of action for the medical expenses incurred by the parents of the plaintiffs as a result of the explosion. At the time of the accident both plaintiffs were 12 years of age. The action was brought by their fathers as the next friends of the plaintiffs. The defendant has raised no issue in this court concerning joinder.

The evidence shows that on July 3, 1980, Ray and Evelyn Stoops entered N.P. Dodge Park in Omaha, Nebraska, with their camper, intending to camp in the park over the 3-day holiday. Evelyn Stoops paid

a $10.50 fee at the concessionaire's office for the use of camper pad No. 25 for the 3-day period. Electrical service was provided at that pad. While they were setting up camp, the Stoopses noticed a black, 55-gallon drum nearby. The black drum was in addition to a trash barrel at the pad, which was a 55-gallon drum from which the top had been removed. Trash barrels, which consisted of 55-gallon drums from which the tops or lids had been removed, were distributed throughout the park, including the camping area. These drums were painted various colors and were labeled "TRASH" on the side.

Printing or lettering on the side of the black drum indicated that it had contained an antifreeze compound. A red or orange label, approximately 4 inches square, was affixed to the top of the drum. The label bore the legend "Flammable Liquid" printed below a representation of a fire or flames.

The lid or top of the black drum was intact, and the drum was closed except for a small opening, approximately 1 inch in diameter, from which a plug had been removed. There is no evidence that the city placed the black drum in the park, and a search of city records showed that the city had not purchased the black drum. The plaintiffs contended that the city was negligent in failing to remove the drum from the park.

On July 5, 1980, the plaintiffs entered the park to visit with their grandparents at camper pad No. 25. In accordance with park policy no admission fee was charged them. Both boys had been given firecrackers by their fathers. The boys used a cigarette lighter to light the firecrackers, and used the black drum as a shelf for their activities. The explosion occurred when they dropped a lighted firecracker into the black drum through the 1-inch hole in the lid. The drum exploded, spraying flammable liquid on the boys. John received severe burns on his

lower extremities. Vince suffered injuries to his nose and arm, and was also burned.

The trial court found that the city had failed to properly supervise the area around camper pad No. 25; had failed to observe, inspect, and remove the 55-gallon drum; had failed to warn the public of the dangerous nature of the drum; was guilty of willful negligence; and that the plaintiffs were not contributorily negligent. Judgment was entered in the amount of $243,190.57 for John Garreans, Jr., and in the amount of $104,726.95 for Vince Hartline.

One of the principal issues in the case was whether the Recreation Liability Act was applicable. The city assigns as error the failure of the court to properly apply the standard of care found in the Recreation Liability Act.

Neb. Rev. Stat. § 37-1002 (Reissue 1978) provides: "Subject to the provisions of section 37-1005, an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes."

Neb. Rev. Stat. § 37-1005 (Reissue 1978) provides: "Nothing in sections 37-1001 to 37-1008 limits in any way any liability which otherwise exists (1) for willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity, or (2) for injury suffered in any case where the owner of land charges the person or persons who enter or go on the land. Rental paid by a group, organization, corporation, the state or federal government shall not be deemed a charge made by the owner of the land."

The act thus provides that an owner of a recreational facility is not liable for ordinary negligence unless a fee was charged for the right to enter the facility, although the owner may be liable for certain willful actions.

The trial court found that the fee paid by Evelyn

Stoops for the use of the camper pad constituted a "charge" for entry upon land and that the actions of the city amounted to "willful negligence."

Findings of fact made by the district court in cases brought under the Political Subdivisions Tort Claims Act will not be disturbed on appeal unless clearly wrong. *Studley v. School Dist. No. 38*, 210 Neb. 669, 316 N.W.2d 603 (1982); *Watson v. City of Omaha*, 209 Neb. 835, 312 N.W.2d 256 (1981).

The city through its operation of N.P. Dodge Park provides camping, picnic, and sports facilities, and the park is a "recreational facility" within the meaning of the act. Neb. Rev. Stat. § 37-1008 (Reissue 1978) provides in part: "(3) the term recreational purposes shall include, but not be limited to, any one or any combination of the following: Hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, winter sports, and visiting, viewing, or enjoying historical, archaeological, scenic, or scientific sites, or otherwise using land for purposes of the user." See *Watson v. City of Omaha, supra.*

The term "charge" is defined in § 37-1008: "(4) the term charge shall mean the amount of money asked in return for an invitation to enter or go upon the land."

The clear meaning of this statute is that in order to constitute a charge, any moneys paid must be paid for the right to enter the facility. Where the language of a statute is plain, direct, and unambiguous, no interpretation is needed, and the court is without authority to change such language. *County of Douglas v. Board of Regents*, 210 Neb. 573, 316 N.W.2d 62 (1982); *State v. Schneckloth, Koger, and Heathman*, 210 Neb. 144, 313 N.W.2d 438 (1981).

The evidence in the present case is undisputed that no charge was made by the city for the right to enter N.P. Dodge Park. Those entering the park paid no admission fee. Charges were made for the right to park a camper on a pad, for the right to

pitch a tent in a tent camping area, and for the use of camper dumping facilities. Payment of the fee by Mrs. Stoops did not entitle her to a greater right to use any of the park's other facilities than that had by the general public. We conclude that the fee paid by Evelyn Stoops was not a charge for entry upon the land but was a fee paid for the right to park a camper upon a specific pad.

This conclusion has been reached by other courts faced with similar issues. In *Stone Mountain Mem. Assn. v. Herrington*, 225 Ga. 746, 171 S.E.2d 521 (1969), a fee paid to park a vehicle in a park was held not to constitute a charge for admission, as no charge was made upon those who entered on foot. See, also, *Jones v. United States*, 693 F.2d 1299 (9th Cir. 1982), wherein a fee for use of an inner tube was held not to be a charge within the contemplation of Washington's recreational use statute.

In *Moss v. Dept.*, 62 Ohio St. 2d 138, 142, 404 N.E.2d 742, 745 (1980), the Ohio Supreme Court stated: "R.C. 1533.18(B) defines a 'recreational user' as one who has permission *to enter* upon 'premises' without the payment of a fee or consideration. It is conceded that the Mosses and decedent O'Neal did not pay a fee 'to enter' the parks; rather, the consideration paid went for the purchase of gas, food and for the rental of a canoe. Nor was this a situation wherein the state attempted to circumvent liability by charging fees for the use of all facilities, in essence charging an entrance fee, although not labelling it as such. It is undisputed that the Mosses and decedent O'Neal could have brought the same items to the parks that they purchased or rented while there, and still have made use of the park facilities. Consideration should not be deemed given under R.C. 1533.18(B) unless it is a charge necessary to utilize the overall benefits of a recreational area so that it may be regarded as an entrance or admittance fee. Appellants' contention is without merit."

Moreover, the fee for use of camper pad No. 25 was paid by Evelyn Stoops and not by the plaintiffs. The plaintiffs therefore were nonpaying, recreational users of the park facilities and thus are not entitled to recover for injuries not caused by the city's willful actions. See *Garfield v. United States*, 297 F. Supp. 891 (W.D. Wis. 1969).

Since the plaintiffs did not pay a charge to enter the park, the next issue which we consider is whether the evidence will support a finding that the city was guilty of a "willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity." A review of the evidence in light of the applicable law warrants only the conclusion that the actions of the city were not willful or malicious. The finding of the trial court on this issue is not supported by the evidence.

In order for an action to be willful or wanton, the evidence must show that one acted with actual knowledge that a danger existed and that he intentionally failed to act to prevent the harm which was reasonably likely to result. The term imparts knowledge and consciousness that injury is likely to result from the act done or omission to act, and a constructive intention as to the consequences. To constitute willful misconduct there must be actual knowledge, or its legal equivalent, of the peril to be apprehended, coupled with a conscious failure to avert injury. To constitute willful negligence the act done or omitted must be intended or must involve such reckless disregard of security and right as to imply bad faith. Wanton negligence has been said to be doing or failing to do an act with reckless indifference to the consequences and with consciousness that the act or omission would probably cause serious injury. 57 Am. Jur. 2d *Negligence* §§ 101-105 (1971).

In *Ashton v. Blue River Power Co.*, 117 Neb. 661, 222 N.W. 42 (1928), a workmen's compensation case, the court stated: "[W]ilful negligence may be de-

fined as (1) a deliberate act; or (2) such conduct as evidenced reckless indifference to safety. As a statutory term it involves more than want of ordinary care. It implies a rash and careless spirit, not necessarily amounting to wantonness, but approximating it in a degree, a willingness to take a chance." (Syllabus of the court.)

In *Roberts v. Brown*, 384 So. 2d 1047, 1048 (Ala. 1980), the court said: " 'Wantonness has been defined as the conscious doing of some act or the omission of some duty which under knowledge of existing conditions and while conscious that, from the doing of such act or the omission of such duty, injury will likely or probably result, and before a party can be said to be guilty of wanton conduct it must be shown that with reckless indifference to the consequences he consciously and intentionally did some wrongful act or omitted some known duty which produced the result. *Griffin Lumber Co. v. Harper*, 247 Ala. 616, 25 So.2d 505; *Taylor v. Thompson*, 271 Ala. 18, 122 So.2d 277; *Johnson v. Sexton* [277 Ala. 627, 173 So.2d 790], supra.' *Lewis v. Zell*, 279 Ala. 33, 36, 181 So.2d 101 (1965)."

In *Ewing v. Cloverleaf Bowl*, 20 Cal. 3d 389, 402, 572 P.2d 1155, 1161, 143 Cal. Rptr. 13, 20 (1978), the court stated: " '[W]illful misconduct implies the intentional doing of something either with knowledge, express or implied, that serious injury is a probable, as distinguished from a possible, result, or the intentional doing of an act with a wanton and reckless disregard of its consequences.' (*Williams v. Carr*, *supra*, 68 Cal.2d 579 584 [440 P.2d 505, 509, 68 Cal. Rptr. 305, 309 (1968)].) 'If conduct is sufficiently lacking in consideration for the rights of others, reckless, heedless to an extreme, and indifferent to the consequences it may impose, then, regardless of the actual state of the mind of the actor and his actual concern for the rights of others, we call it willful misconduct. . . .' "

In *Jones v. United States*, 693 F.2d 1299 (9th Cir.

1982), the court addressed the issue of what constitutes willful or wanton misconduct under Washington's recreational use statute. The court held that the defendant must act or fail to act with actual knowledge of the hazard in order to be held liable under the statute.

The record does show that park employees did not observe the barrel on their routine trips through the park. The employees testified that had they noticed the barrel, they would have removed it.

The failure to observe the barrel may have been ordinary negligence in that the city in the exercise of due care "should have known" of the existence of a danger, but that does not amount to willful misconduct. An actor cannot act willfully in failing to remove a danger when he has no knowledge of it.

The city has also assigned as error the finding of the trial court that the plaintiffs were not guilty of contributory negligence. An actor is contributorily negligent if he breaches the duty imposed upon him by law to protect himself from injury; if his actions concur and cooperate with actionable negligence of the defendant; and if his actions contribute to his injuries as a proximate cause. *Stephen v. City of Lincoln*, 209 Neb. 792, 311 N.W.2d 889 (1981). A child is required to exercise that degree of care which a person of that age would naturally and ordinarily use in the same situation under the same circumstances. *Huff v. Ames*, 16 Neb. 139, 19 N.W. 623 (1884); *Camerlinck v. Thomas*, 209 Neb. 843, 312 N.W.2d 260 (1981).

Although we have concluded that no "willful or malicious" negligence existed on the part of the city, we believe the evidence in this case shows that the plaintiffs were contributorily negligent sufficient to bar their recovery as a matter of law. The finding of the trial court to the contrary was clearly wrong.

The use of firecrackers in the city of Omaha and within the park was prohibited by ordinance, as well as by park regulation. The plaintiffs had been

warned by their parents that fireworks were dangerous and that they should be careful when using them. The plaintiffs testified that they were aware of the danger involved in using fireworks. The degree of care required increases when an actor is dealing with a dangerous activity such as exploding firecrackers. See *Martinez v. Hoveling*, 184 Neb. 560, 169 N.W.2d 428 (1969). Despite these warnings, the evidence is that the plaintiffs were lighting firecrackers above the opening in the drum and dropping lighted firecrackers into the drum.

Although there is conflicting testimony with regard to whether the boys noticed the "flammable" marking on the drum, the label was plainly visible, and the plaintiffs testified that they understood what the term "flammable" meant. In the exercise of proper care the boys should have seen the warning label on the top of the drum upon which they were lighting firecrackers. Moreover, they should have known that dropping lighted firecrackers into the drum created an unreasonable risk of explosion.

In the following cases the actions of children with regard to their use of firecrackers was held to be contributory negligence: *Thornton v. Ionia Free Fair Association*, 229 Mich. 1, 200 N.W. 958 (1924) (14-year-old, who had experience with firecrackers, held negligent in setting off firecrackers he found at fairgrounds); *Mathews v. City of Albany*, 36 Cal. App. 2d 147, 97 P.2d 266 (1939) (12-year-old who had knowledge of properties of fireworks held contributorily negligent); *Shelanie v. National Fireworks Association*, 487 S.W.2d 921 (Ky. App. 1972) (14-year-old who admitted he knew and had been warned about dangers of fireworks held contributorily negligent).

The judgment of the district court is reversed and the cause remanded with directions to dismiss the petition.

REVERSED AND REMANDED
WITH DIRECTIONS.

SHANAHAN, J., dissenting.

The majority opinion misconstrues the Recreation Liability Act, Neb. Rev. Stat. §§ 37-1001 through 37-1008 (Reissue 1978). Section 37-1001 states: "The purpose of sections 37-1001 to 37-1008 is to encourage owners of land to make available to the public land and water areas for recreational purposes by limiting their liability toward persons entering thereon and toward persons who may be injured or otherwise damaged by the acts or omissions of persons entering thereon." The legislative history of the Recreation Liability Act and numerous interpretative decisions by courts of states having statutes similar to the Nebraska act compel the conclusion that the act does not apply to the present case. The Recreation Liability Act is designed to encourage public access to and recreational use of privately held undeveloped lands. To induce the private landowner's permission for such public use, the Legislature has promised reduced exposure to liability for injuries occurring in recreational areas opened to the public. See, *Tallaksen v. Ross*, 167 N.J. Super. 1, 400 A.2d 485 (1979); *Harrison v. Middlesex Water Company*, 158 N.J. Super. 368, 386 A.2d 405 (1978); *Michalovic v. Racing Assn*, 79 A.D.2d 82, 436 N.Y.S.2d 468 (1981); *Johnson v. Stryker Corp.*, 70 Ill. App. 3d 717, 388 N.E.2d 932 (1979); *Cedeno v. Lockwood, Inc.*, 250 Ga. 799, 301 S.E.2d 265 (1983). "The purpose of this [recreational use legislation] is to limit the liability of private landowners, thereby encouraging them to make their property available for public recreation. . . . Thus, there is an objective basis for the aim of recreational use acts: to promote increased public access to private lands by reducing the liability of landowners and occupiers." Barrett, *Good Sports and Bad Lands: The Application of Washington's Recreational Use Statute Limiting Landowner Liability*, 53 Wash. L. Rev. 1, 3-4 (1977). By the Recreation Liability Act the state avoids expensive acquisition of considerable land for

public recreational use, that is, state-owned or -leased areas, and in return grants restricted or limited liability to private landowners providing areas for public recreation. Consequently, the question of negligence in operating a city park is not within the purview of the Recreation Liability Act. Putting aside the particular situation involved in this case, patrons of public parks should be alert to the effect of the majority opinion and its rule regarding care required in operating a municipal park, i.e., responsibility for injury caused only by willful or malicious failure to protect the public admitted without charge to any city park.

Without conceding applicability of the Nebraska Recreation Liability Act to the present case, we disagree with other aspects of the majority opinion.

There were 46 camper pads within the city park. Ray Stoops, grandfather of the plaintiffs, paid $10.50 to park his trailer on camper pad No. 25. The fee or charge entitled the Stoopses to 3 days' occupancy of the camper pad, namely, until July 6, according to registration receipt No. 6268 issued by the park caretaker for pad No. 25. Also, in exchange for the fee, the city provided Stoops with electrical service for his camper pad, or, as the city superintendent of parks testified, Stoops was "allowed to plug into the electrical stanchion that's at that particular pad for his trailer." Electrical service was not available to everyone entering the park but was provided only to those paying for particular camper pads. As testified by city park employees, the superintendent of parks, district foreman, and caretaker for the park, Stoops had "exclusive possession" of pad No. 25, for, as the superintendent of parks testified, "That's the whole intent." The district park foreman acknowledged that when a person "rented" a pad, that person was entitled to exclusive use to the extent that, upon request by the paying occupant of the pad, park personnel would remove any unwanted or unauthorized person intruding upon the camper pad.

If those efforts of park personnel were unsuccessful, police would be summoned to remove the unwanted intruder. As described by the park caretaker: "I would call the cruiser." The park caretaker also testified there was no restriction regarding visitors to Stoops' camper pad, including visits by Stoops' grandchildren, which was "consistent with the fee that he paid."

The majority opinion acknowledges that Stoops paid "a fee . . . for the right to park a camper upon a specific pad." Although the majority feels that the nature of negligence under the Recreation Liability Act turns only on the presence or absence of a charge for admission, an admission fee is not the sole determinant regarding the type or degree of negligence required for liability under the act. The March 26, 1965, Committee Statement on L.B. 280 (Recreation Liability Act), of the Agriculture and Recreation Committee, contains the following: "The act provides no inherent limitations on liability for willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity, or for injury suffered in any case when a charge is made *unless that charge be in the nature of rent.*" (Emphasis supplied.) Stoops' use and occupancy of the camper pad included benefits and rights not enjoyed by the general public admitted to the park, and even included exclusion of the public from the camper pad, if Stoops saw fit. Stoops acquired such benefits and rights by payment of the fee or charge not required of the general public for admission to the park. In the final analysis, and by any reasonable definition or construction, the charge paid by Stoops was rent, that is, consideration or compensation "paid for use or occupation of property." Black's Law Dictionary 1166 (5th ed. 1979). See, *Modular Concepts, Inc. v. So. Brunswick Twp.*, 146 N.J. Super. 138, 369 A.2d 32 (1977); *Rosewood Corp. v. Transamerica Ins.*, 57 Ill. 2d 247, 311 N.E.2d 673 (1974); *Whiting Paper Co. v. Holyoke Water Power*

*Co.*, 276 Mass. 542, 177 N.E. 574 (1931); *White Roofing Company v. Wheeler*, 39 Ala. App. 662, 106 So. 2d 658 (1957); *Kennedy v. Boston-Continental Nat. Bank*, 11 F. Supp. 611 (D. Mass. 1935); *Young v. Home Telephone Co.*, 201 S.W. 635 (Mo. App. 1918). "Charge," within the Recreation Liability Act, includes not only payment for admission to a recreational area but also the charge paid for the use or occupancy of a site within the recreational area. The Recreation Liability Act was clearly intended to preserve rights of persons injured by ordinary negligence of the landowners charging rent as in the case now before us.

As one of the grounds for denying recovery by the plaintiffs, the majority states: "Moreover, the fee for use of camper pad No. 25 was paid by Evelyn Stoops [plaintiffs' grandmother] and not by the plaintiffs." Lurking within the majority opinion is the requirement of privity—liability dependent upon a precedent contractual relationship between the injured person and the negligent tort-feasor. "At one time a showing of privity was considered necessary to occasion liability for negligence, but the courts have been getting away from that doctrine and many have entirely repudiated and discarded it; and under the modern doctrine liability is based on foreseeability rather than privity." 65 C.J.S. *Negligence* § 4(11) at 502 (1966). Justice Cardozo, almost 70 years ago, rejected the condition or requirement of privity in a product liability suit for negligence, when he stated in *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 390, 394, 111 N.E. 1050, 1053-54 (1916): "We have put aside the notion that the duty to safeguard life and limb, when the consequences of negligence may be foreseen, grows out of contract and nothing else. . . . [F]oresight of the consequences involves the creation of a duty." As expressed in *Nelson v. Union Wire Rope Corp.*, 31 Ill. 2d 69, 86, 199 N.E.2d 769, 779 (1964): "It is axiomatic that every person owes to all others a duty to exercise ordinary

care to guard against injury which naturally flows as a reasonably probable and foreseeable consequence of his act, and that such duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons." See, also, *Webel v. Yale University*, 125 Conn. 515, 7 A.2d 215 (1939); cf., *McKinley v. Slenderella Systems of Camden, N.J., Inc.*, 63 N.J. Super. 571, 165 A.2d 207 (1960); *Robinson v. Colebrook Guaranty Bank*, 109 N.H. 382, 254 A.2d 837 (1969). Today, most courts adhere to the rule that duty as an element of negligence is based not on privity but on foreseeability that harm may result if care is not exercised. See, *Harvard v. Palmer & Baker Engineers, Inc.*, 293 Ala. 301, 302 So. 2d 228 (1974); *Orlo v. Connecticut Co.*, 128 Conn. 231, 21 A.2d 402 (1941); cf. *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 598 P.2d 60, 157 Cal. Rptr. 407 (1979). "The duty of vigilance to prevent injury has its source in the law applicable to human relations rather than in a narrow conception of privity." 57 Am. Jur. 2d *Negligence* § 37 at 385 (1971). In the case before us it was foreseeable that family members, including the Stoopses' grandchildren, would be visiting Ray and Evelyn Stoops at their trailer. This foreseeability resulted in the city's duty to use reasonable care in protecting Stoops' visitors, namely, guarding against injuries caused by hazards such as the barrel bomb on pad No. 25. It is some small solace that the explosion did not launch the trailer from the pad. "The rule of reasonable care under the circumstances could not limit the conduct of Robinson Crusoe as he was first situated. But as soon as he saw the tracks in the sand, the rule began to have vitality. He then had notice that there might be other persons on the island, and this knowledge of their presence made it his duty as a reasonable man to use reasonable care to the end that no act of his should injure them." *Huckabee v. Grace*, 48 Ga. App. 621, 628, 173 S.E. 744, 749 (1934). Footprints, camper pads, and trash bar-

rels; the result is the same. At sea on privity, Nebraska jurisprudence will find itself on an island without even Crusoe.

Established park policy called for removal of any barrel not placed in the park by the city. The city had no black barrels as a part of the trash collection system for the park. (On July 5, after the explosion and in front of the caretaker's house in the park, an arson investigator for the Omaha Police Department found a similar "55-gallon drum, trash-can" bearing a precaution about contents with an "extremely high flash point.") City employees made frequent trips in the area of pad No. 25 and daily removed trash from the other, differently colored barrel sitting inches from the black barrel. The city's activity, or more aptly the city's inactivity, and the barrel's continued presence at pad No. 25 would lead anyone to conclude there was nothing dangerous in that setting. As testified by Evelyn Stoops, grandmother of the plaintiffs: "Anything in the park is supposed to be safe . . . ." Under the circumstances one would reasonably believe and rely that the city had provided a safe park and not a dump for a discarded, dangerous barrel containing combustible material. " 'In determining the sufficiency of the evidence to sustain a judgment, it must be considered in the light most favorable to the successful party. Every controverted fact must be resolved in his favor and he is entitled to the benefit of every inference that can reasonably be deduced from the evidence.' [Citations omitted.] Moreover, under the Political Subdivisions Tort Claims Act, section 23-2406, R.R.S. 1943, the 'findings of a District Court under the act will not be disturbed on appeal unless they are clearly wrong.' [Citation omitted.]" *Daniels v. Andersen*, 195 Neb. 95, 98, 237 N.W.2d 397, 400 (1975). Negligence—the city's negligence and contributory negligence of the plaintiffs—was a question of fact resolved by the trial court in favor of the plaintiffs.

That conclusion and determination is not clearly wrong.

For these reasons the judgment of the trial court should have been affirmed.

WHITE and GRANT, JJ., join in this dissent.